UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 AUG 28  AM 11: 49

CLERK

BY_____
DEPUTY CLERK

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| MIDDLEBURY COLLEGE, | ) |
| | ) |
| Defendant. | ) |

Docket No.  1:15-cv-192

## PLAINTIFF'S EMERGENCY MOTION FOR A PRELIMINARY INJUCTION AND MEMORANDUM OF LAW IN SUPPORT THEREOF

Now comes the plaintiff, and respectfully requests, pursuant to Fed. R. Civ. P. 65(a), that

this Court grant a preliminary injunction enjoining defendant Middlebury College from expelling

him from the College.  Plaintiff requests an immediate preliminary injunction that will allow him

to attend class when the fall semester starts on September 16, 2015.  In light of the urgency of

this motion, plaintiff requests an expedited briefing and hearing schedule.  We have notified

counsel for defendant of this request and have not yet received assent to an expedited briefing

schedule.  Any further delay will compromise plaintiff's education at Middlebury, his ability to

graduate in the summer of 2016, and will cause revocation of his offer of employment to begin in

July 2016.  As grounds for this motion, plaintiff relies on the following Memorandum of Law.

### INTRODUCTION

In this suit, plaintiff challenges Middlebury's decision to conduct a second investigation

and adjudication of a claim of sexual assault again plaintiff made by a non-Middlebury student

after another educational institution had already investigated the complaint, held a hearing on the

matter, and found plaintiff not responsible for the charge. As set forth below, plaintiff meets the

requirements for preliminary injunctive relief. He will suffer irreparable injury absent immediate injunctive relief because he will not be permitted to complete his last year at Middlebury and will lose a job offer that is contingent on his graduation from Middlebury next summer.  Plaintiff is also likely to succeed on the merits or at least demonstrate sufficiently serious questions going to the merits.  Middlebury's decision to hold a second investigation and hearing, the unfair, arbitrary, and biased manner in which it conducted the investigation and decision-making process, and the eight-month delay in its process violated its obligations to plaintiff, as set forth in its Student Handbook and other policies, and Title IX of the 1972 Education Amendments. The balance of hardships decidedly tips in plaintiff's favor because plaintiff will suffer substantial harm if he is not permitted to resume his studies, but Middlebury will suffer no harm given that Jane Doe is not a student at Middlebury and Middlebury permitted plaintiff to attend school and live on campus with no restrictions for the entire spring semester while the investigation was pending.  For these reasons and the reasons set forth below, the court should grant plaintiff preliminary injunctive relief.

## FACTS[1]

Plaintiff enrolled as an undergraduate at Middlebury College in spring 2013.  Exhibit P-1 ¶ 3.  In the fall of 2014, he participated in a study abroad program run by the School for International Training (SIT), an educational institution based in Vermont and subject to the laws of Vermont and the United States.  Exhibit P-1 ¶ 7.  While abroad, plaintiff had a consensual sexual encounter with Jane Doe, who was participating in the same SIT program, but who

---

[1] The facts of this case are alleged in detail in plaintiff's Complaint and his Affidavit, attached hereto as Exhibit P-1, which he incorporates into this memorandum.  Plaintiff will use the designation "P" for those exhibits filed on the public record and "S" for those exhibits filed pursuant to his Motion to Seal.

attends a different college.  Exhibit P-1 ¶¶ 14-17.  Jane Doe initiated this encounter, which occurred in the presence of a mutual friend, Witness 1, by sexually touching plaintiff, telling him she wanted to have intercourse with him, and taking off her clothing. *Id.*  Jane Doe later alleged that she had not consented to the encounter because she had been incapacitated by alcohol, and alleged that she had no memory of the events leading up to engaging in sexual intercourse with the plaintiff.  Exhibit S-1 at 14-15.[2]  SIT immediately began an investigation and adjudication procedure, and notified Middlebury of the complaint against the plaintiff and of the steps it was taking to address it. Exhibit P-1 ¶¶ 28, 30.  Plaintiff and Jane Doe participated in a hearing at SIT in early December 2014, Exhibit S-2, and SIT found plaintiff not responsible for the charges against him.  Exhibit S-3.  SIT informed Middlebury of the outcome of the case.  Exhibit P-1 ¶¶ 47.  Jane Doe did not appeal SIT's decision. . Exhibit P-1 ¶ 48.

In January 2015, plaintiff returned to Middlebury and participated in the January term at the college. . Exhibit P-1 ¶ 49.  That month, Jane Doe complained to Middlebury that plaintiff had engaged in non-consensual sex with her; a charge for which SIT had already found plaintiff not responsible.  Exhibit S-4.  In her initial communication with Middlebury, Jane Doe noted that in her view "Title IX procedure was not followed" by SIT, and as a result she had filed a complaint against SIT with U.S. Department of Education's Office for Civil Rights ("OCR"). *Id.* She stated "I am hoping to work with Middlebury to ensure a proper investigation . . . ." *Id.*  In

---

[2] Plaintiff has attached as exhibits portions of Middlebury's investigation file relevant to this motion.  He has not provided the entire investigation file so as not to flood the court with unnecessary documents, and because these documents contain sensitive, private information the release of which could harm plaintiff or Jane Doe.  *See* Pl. Motion to Seal.  Because Middlebury provided the materials to plaintiff in a secured electronic format, which he could not print, he has reproduced them as best he can.  To the extent the Court finds it necessary to review the additional investigation materials, plaintiff can attempt to reproduce them for the Court and file them under seal.

late January 2015, Middlebury initiated an investigation into the complaint, allegedly because it was concerned that plaintiff might pose a threat to the Middlebury community. Exhibit S-5. Despite Middlebury's policies placing a 45-day time limit on the investigation of complaints, the investigation and adjudication of Jane Doe's complaint took nearly eight months from the time Middlebury first received notice of her allegations against plaintiff in November, and nearly six months from the time of her initial contact with Middlebury. Exhibit P-1 ¶ 63. Throughout the spring 2015 semester, plaintiff lived on Middlebury's campus and attended classes and college events. Exhibit P-1 ¶ 49.

Middlebury's investigation and adjudication process was undertaken in a biased, unfair, and arbitrary and capricious manner. Exhibit P-1 ¶¶ 64, 80-97. The investigator and Human Resources Officer (HRO), who decided the case, approached the case looking to find plaintiff responsible for sexual misconduct, and cherry-picked evidence, misstated evidence, and concocted irrational interpretations of the evidence to support that predetermined conclusion. Exhibit S-6; Exhibit S-7. On July 10, 2015, Middlebury found plaintiff responsible for sexual misconduct. Exhibit S-7. On July 24, 2015, Middlebury issued its decision to expel him. Exhibit S-8.

Plaintiff appealed these decisions, arguing that Middlebury's policies prohibited it from conducting a *de novo* investigation and adjudication of a matter that had already been fully and fairly heard and decided by SIT. Exhibit S-9. He also argued that the unfair and biased manner in which the investigation and decision-making process were undertaken violated Middlebury's policies. *Id.* Middlebury denied plaintiff's appeal on August 4, 2015. Exhibit S-10. Plaintiff appealed that determination the president of the college, Exhibit S-11, who denied his appeal on August 26, 2015. Exhibit S-12.

In August 2015 plaintiff was offered post-graduation employment at a company.  Exhibit S-13.  His offer for employment is contingent upon him finishing his degree at Middlebury by the time the job is set to begin in July 2016.  *Id.*  The fall semester at Middlebury College begins on September 16, 2015.

## ARGUMENT

This Court may grant a preliminary injunction where the party seeking the injunction demonstrates: (1) that he will suffer irreparable injury absent the injunctive relief; and (2) either (a) that he or she is likely to succeed on the merits, or (b) "that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005), *quoting No Spray Coalition, Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001).  These factors weigh in favor of granting plaintiff a preliminary injunction to allow him to continue his education at Middlebury pending resolution of this case.

## I.    PLAINTIFF WILL SUFFER IRREPARABLE INJURY IF HE IS EXPELLED FROM MIDDLEBURY

"To establish irreparable harm, a party seeking preliminary injunctive relief must show that 'there is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'" *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002), *quoting N.Y. Pathological & X–Ray Labs., Inc. v. INS,* 523 F.2d 79, 81 (2d Cir.1975).  Plaintiff faces such harm.

Plaintiff has been offered a job at a company to begin in July 2016.  That job is contingent upon him finishing his degree program at Middlebury before the job begins.  *See*

Exhibit S-13. If plaintiff cannot begin his senior year on September 16, 2015, he will not be able to complete his program before next summer, and the job offer will be revoked.

No post-trial remedy can redress the harm this expulsion would cause. Plaintiff will lose his job. Even if he later finishes his degree at Middlebury his academic record will be marred by a significant gap in education that he will have to explain to any future educational programs or jobs to which he applies. The only truthful explanation he will have is that he was expelled from Middlebury after he was wrongfully accused of sexual misconduct. This response will certainly have a negative impact on his ability to gain entrance to graduate school or to obtain a job, despite his innocence of the charges against him.

If plaintiff does gain employment even after a long hiatus in his schooling, he will not be able to recoup the income lost from having his education and employment delayed during the pendency of the trial. *See Doe v. New York Univ.*, 666 F.2d 761, 773 (2d Cir. 1981), *superseded in part on other grounds*, *Zervos v. Verizon New York, Inc.*, 252 F.3d 163 (2nd Cir. June 5, 2001) (contrasting irreparable harm occasioned by schooling interruption with lesser harm of delay beginning graduate program by a year where plaintiff was employed and could continue to be employed during the pending year).[3]

Courts considering these motions in similar cases have found that irreparable harm will come from a suspension or expulsion from a university. *See* Order granting preliminary injunction, *McLeod v. Duke University*, No. 14-CVS-3075, 2014-WL-8843115 (N.C. Sup. Ct., May 29, 2014) (attached hereto as Exhibit P-2); Order granting temporary restraining order, *Doe*

---

[3] Even if the court considers the expulsion in this case to be in effect, the Second Circuit has held that courts can issue a preliminary injunction where the harm has already occurred if they can restore the status quo. *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005). In this case, the court can restore the status quo by requiring Middlebury to allow plaintiff to return to campus in good standing until this case is decided.

*v. George Washington University*, No. 11-cv-00696, (D. D.C., April 8, 2011) (attached hereto as Exhibit P-3); Order granting preliminary injunction, *Coulter v. E. Stroudsburg Univ.*, No. CIV.A.3:10CV0877, 2010 WL 1816632, at *3 (M.D. Pa. May 5, 2010).  This Court should likewise find that the only way to prevent irreparable harm to plaintiff is to enjoin Middlebury from imposing the expulsion and order it to allow plaintiff to return for the fall 2015 semester.

**II.     PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS CASE**

Plaintiff is likely to succeed on his state law contract claims and Title IX claim, as is evident from an examination of Middlebury's policies and the factual record.

**A. Middlebury Violated its Contract with Plaintiff by Failing to Adhere to its Written Policies**

By enrolling in Middlebury and paying tuition, plaintiff entered into a contract with the college whereby the college is bound to adhere to the statements made in its "brochures, course offering bulletins, and other official statements, policies and publications of the institution." *Merrow v. Goldberg,* 672 F. Supp. 766, 774 (D. Vt. 1987).  Middlebury is thus bound "to conduct its hearings in a manner consistent with [its sexual misconduct policy]." *Fellheimer v. Middlebury College*, 869 F. Supp. 238, 242 (D. Vt. 1994).

**1. Middlebury Had No Authority to Investigate a Case Already Decided by SIT**

Although Middlebury's Policy Against Sexual Misconduct, Domestic Violence, Dating Violence and Stalking (SMDVS) contains broad language granting Middlebury authority to investigate any allegation of a policy violation that takes place any time a student is enrolled at Middlebury, Exhibit P-4 at § 11, its policies related to study abroad programs and its course of conduct in plaintiff's case demonstrate that Middlebury authorizes study abroad programs to administer their own disciplinary processes in lieu of Middlebury.

The Middlebury Study Abroad Pre-Departure Handbook fails to explicitly incorporate the

SMDVS, but does have a section explaining how honor code violations will be addressed while a

student is abroad. That section of the policy states, in relevant part

> Violations will be evaluated and discipline will be determined by the externally
> sponsored program or host university, as applicable. This may include resolution
> through processes designated by that program, or through Middlebury College's
> academic disciplinary process, as appropriate.

> Middlebury reserves the right to take disciplinary action upon a student's return to
> Middlebury, if deemed appropriate by the Dean of International Programs and the
> Judicial Affairs Officer, in consultation with others. Students may not seek to
> appeal at Middlebury any disciplinary procedures determined or conducted by the
> externally sponsored program or host university.

Exhibit P-5 at 17-18.  Given that the Pre-Departure Handbook contains no provisions for how

other types of disciplinary violations will be handled, a student studying abroad would

reasonably expect that this section would govern conduct violations as well as honor code

violations. *See Reynolds v. Sterling College, Inc.,* 170 Vt. 620, 622 (2000) (interpreting student

contract with university by looking to "reasonable expectation" of the student). This section is

clear that Middlebury could not do exactly what it did in this case:  reevaluate a case the

externally-sponsored study abroad program had already decided.  Middlebury reserves the right

to take additional "disciplinary" action upon a student's return, but does not reserve the right to

"evaluate" the case if the externally-sponsored program has already done so. The fourth sentence

of this section confirms this understanding of the policy, prohibiting students from appealing the

decision of a study-abroad program to Middlebury. Despite this language in its policies,

Middlebury permitted Jane Doe to appeal SIT's decision to Middlebury.

The "Acknowledgment and Assumption of Risks and Release Agreement" that plaintiff

signed before departing for his study abroad program further indicates that Middlebury

authorizes external programs to handle misconduct complaints against its students. That document states:

> I understand that my participation in the Program will be subject to the standards of behavior and academic requirements of the sponsoring U.S. institution and any host institution.  I recognize that it is my responsibility to familiarize myself with all such standards and requirements and I understand that if I fail to comply with such standards and requirements I may be subject to discipline, up to and including dismissal from the Program.

Exhibit P-6, at 4 of 5.  This section makes no mention of the student being subject to Middlebury's standards of behavior while abroad, but requires the student to affirm his understanding that the sponsoring U.S. institution (in this case, SIT) has the authority to discipline him for violations of behavioral expectations while studying abroad.  The release puts students on notice of potential disciplinary action by the sponsoring institution, but not by Middlebury.

To the extent the language of the SMDVS conflicts with the language of the Pre-Departure Handbook or the Acknowledgment and Assumption of Risks and Release Agreement, creating an ambiguity in the contract between plaintiff and Middlebury, the ambiguity must be read against the college.  *Reynolds,* 170 Vt. at  622, *quoting Gamble v. University System of New Hampshire,* 136 N.H. 9, 14-15 (1992) ("This court will, where possible, avoid constructing the contract in a manner that leads to harsh and unreasonable results or places one party at the mercy of the other. To interpret the contract as the defendants urge us would leave the student at the mercy of the University.").  In order to determine if there is ambiguity in the contract, the court must look to the "circumstances surrounding the making of the agreement," including the course of dealing between the parties, *Isbrandtsen v. North Branch Corp.*, 150 Vt. 575, 578-79 (Vt. 1988), which includes the parties' performance under the contract.  *B&C Management Vermont, Inc. v. John*, 2015 WL 1586834 at 3 n.2 (April 10, 2015).

Middlebury was put on notice of the allegations against plaintiff when they were made in November 2014.  Middlebury did not intervene in the SIT proceeding, nor did it begin its own investigation into the allegations at that time.  Middlebury remained apprised of SIT's handling of the case and the outcome of the case, according to Middlebury Dean Matthew Longman in order to determine whether there was any concern with plaintiff returning to the Middlebury campus in January 2015. There was evidently no such concern, as Middlebury allowed plaintiff to return to campus and complete the entire January term before it began the second investigation into the complaint.  Middlebury clearly intended to defer to SIT's handling of the allegations against plaintiff, and only changed course when presented with a veiled threat from Jane Doe implicitly suggesting that she might report Middlebury to federal authorities if it did not investigate her claims and find plaintiff responsible for sexual misconduct.

As indicated by Middlebury's policies and its course of conduct, Middlebury was not authorized to initiate a second investigation of Jane Doe's complaint after deferring to SIT to investigate and adjudicate the identical complaint.

### 2. Middlebury's Investigation and Adjudication Were Unfair and Biased in Violation of its Policies

Middlebury's SMDVS policy guarantees that it will treat its students fairly in sexual misconduct investigations and adjudications. Section 1 states that Middlebury's process to address cases of alleged sexual misconduct is designed to "[c]onduct a timely, fair, impartial, and equitable investigation and adjudication with thoroughness and respect for all involved parties." Exhibit P-4 at § 2.  It also states "[t]he procedures outlined below are designed, however, to assure fundamental fairness and to protect individuals from arbitrary and capricious disciplinary action." *Id.* at § 1.  The SMDVS also states that "[respondents] will be treated with sensitivity,

dignity, respect and in an unbiased manner by all involved administrators, investigators, and adjudicators." *Id.* at § 10(B).

> a. Conducting a Second Investigation after SIT Cleared Plaintiff of the Charges Was Fundamentally Unfair

As a judge in this court has held, interpreting some of the same language in Middlebury's policies twenty years ago, even where "exceptional circumstances" are present that would justify deviation from its written policies, at a minimum Middlebury guarantees students that they will be treated in accordance with fundamental fairness. *Fellheimer,* 869 F. Supp. at 243-44. As discussed above, Middlebury's initiation of the second investigation against plaintiff violated its policies. Even if Middlebury could articulate some circumstance to justify a deviation (which it has not), re-hearing the complaint on which plaintiff was exonerated at SIT is not in accordance with fundamental fairness.

In every area of the law there are prohibitions against wholesale re-litigation of cases absent extremely persuasive reasons. For this reason, we have the double jeopardy clause in criminal cases, and in Vermont courts are permitted to dismiss criminal cases with prejudice after one or more hung juries. The Supreme Court of Vermont has explained this statute:

> [T]he repeated reprosecution of a defendant for the same crime following hung juries where no new evidence exists raises issues concerning traditional notions of fundamental fairness and substantial justice. Repeated trials involving the same offense can frustrate the search for truth and the effective administration of justice by depleting the resources of the parties, by imposing hardships on witnesses, and by fostering the perfunctory presentation of stale testimony, the exaggeration of subtle differences in witnesses' recollections to challenge their credibility, and the tailoring of testimony based on the jury's perceived reaction in prior trials.

*State v. Sauve,* 164 Vt. 134, 142 (1995). While this prosecution of plaintiff for sexual assault is not a criminal proceeding, the *Sauve* reasoning is equally applicable to the instant case. As this case demonstrates, repeated hearings have frustrated the search for truth, have allowed for

exaggeration in witness statements, and allowed the tailoring of complainant and witness testimony to the perceived reaction of the decision maker in the prior hearing.

In the civil context, the doctrines of collateral estoppel and res judicata also prevent litigants from obtaining multiple bites at the apple when the issues raised in their cases or their claims have already been heard and decided. The Vermont Supreme Court has highlighted four goals these doctrines promote:

> (1) to conserve the resources of courts and litigants by protecting them against piece-meal or repetitive litigation; (2) to prevent vexatious litigation; (3) to promote the finality of judgments and encourage reliance on judicial decisions; and (4) to decrease the chances of inconsistent adjudication.

*In Re Tariff Filing of Cent. Vermont Pub. Serv. Corp.,* 172 V5. 14, 20 (2001). Again, though not strictly applicable to university quasi-judicial proceedings, the explanation of judicial values embodied in these doctrines equally support finding that there must be end point to the ability of a complainant or college re-litigating a claim until it obtains its desired outcome, in order to encourage finality and decrease the chances of inconsistent adjudication.

Recently, a federal court in North Carolina recognized these principals in finding that the university was not permitted to conduct *de novo* hearings on a sexual assault complaint that had already been decided in the plaintiff's favor. *Tanyi v. Appalachian State University, et al.*, No. 5:14-cv-170RLV, 2015 WL 4478853 (W.D. N.C. July 22, 2015). In *Tanyi,* the plaintiff had been accused of sexual misconduct, and found innocent by the university's panel, and then was re-tried on the same allegations. *Id.* at *1, *2. The court determined that "a clearly articulated substantive basis must exist for granting a new trial. Otherwise, as Tanyi argues, ASU could simply order a new misconduct trial whenever the university did not prevail--which is exactly what is alleged here." *Id.* The court found the second trial violated due process because it was fundamentally unfair.

Middlebury's decision to defer to SIT's decision in plaintiff's case until Jane Doe complained to Middlebury about the outcome and implicitly suggested she might report Middlebury to the OCR for investigation, is exactly the type of fundamental unfairness that is prohibited in both criminal and civil trials, as well as by Middlebury's own policies. Plaintiff is thus likely to succeed on his claim that Middlebury violated its guarantee of fundamental fairness by re-hearing Jane Doe's complaint after it had already been decided in plaintiff's favor.

       b.  <u>Middlebury's Investigation and Adjudication was Biased Against Plaintiff</u>

Upon information and belief, Middlebury uses a presentation developed by the firm Margolis Healy (a firm in which a Middlebury administrator and Middlebury's counsel are listed as faculty) to train its administrators to address allegations of sexual assault. The training teaches administrators not to conduct the fair and impartial proceedings to which students are entitled. The training suggests the goal of the adjudication process is finding the student guilty, not determining the truth of what happened or even whether – as Middlebury policies require – the preponderance of the evidence demonstrates the accused student is guilty. The training teaches administrators to "[s]tart by believing" the victim, and to "interview" the complainant but "interrogate" the respondent. Exhibit P-7 at 27, 32. The section on "Approaching the Sexual Assault Case" states "How you approach the victim is critical to whether you succeed in holding the offender accountable." *Id.* at 26. The training tells administrators "when a victim reports sexual assault to you there is a 91-95% likelihood that the perpetrator is a serial offender." *Id.* at 3. This statement teaches administrators to consider the respondent not only guilty of the allegation before the investigation is even completed but of other offenses as well.

The materials instruct administrators on what defenses "offenders" may raise, and how to manipulate the facts in a case to defeat those defenses, assuming that those defenses could never be valid or true. The materials specifically state:

- Offenders manipulate victim, witnesses, and investigator . . .
- Offenders plan their crimes and response to questioning; crime is not a "misunderstanding"
- Want us to believe it is "he said, she said"
- Sexual offenders are repeat offenders who often commit co-occurring and interrelated crimes; sexual harassment, stalking, IPV

*Id.* at 17. Throughout the training, the idea that women could or would voluntarily consent to sexual activity is treated as an impossibility; instead, the training lists "consent" as one of many defenses a respondent might try to make, *id.* at 24, and instructs administrators not to use "consensual language" in writing their findings, *id.* at 35, evincing a belief that there never could be valid consent once a woman makes an allegation of assault.

The training teaches Middlebury administrators that all "offenders" plan their crimes, and provides stories of admitted criminal sex offenders who describe how they executed sexual assaults. *Id.* at 17. The materials state that a barrier to preventing sexual assault is focusing on what the complainant did during the incident, and directs administrators to look only at the accused student's actions. *Id.* at 18. It explicitly instructs administrators to ignore inconsistencies in the complainant's story, attributing any inconsistency to the trauma of being assaulted. *Id.* at 21, 29. The training includes a cautionary tale of a criminal case where the prosecution did not credit a victim's story because of inconsistencies, only to learn later that she had been the victim of a serial rapist who appears to have assaulted more women before he was apprehended. *Id.* at 19-20. The clear message given to Middlebury administrators is to assume the guilt of the accused, assume he is a serial offender who poses a risk to other students, and believe the victim regardless of any holes or inconsistencies in her story.

The investigator and HRO in plaintiff's case appear to have followed these instructions to the letter in constructing a biased investigation and adjudication aimed at finding plaintiff guilty. They failed to consider evidence in the record calling into question Jane Doe's credibility, including her misrepresentations to Middlebury and inconsistencies in her testimony. *See* Exhibit P-1 ¶¶ 69, 76-79. They failed to consider evidence undermining the credibility of Jane Doe's friends who served as witnesses, particularly Witness 1, whose statements to the investigator contradicted her reports to SIT and the statements of other witnesses. *Compare* Exhibit S-14, at 17-18 *with* Exhibit S-1, at 25-29. *See also* Exhibit P-1 ¶¶ 72-75. The HRO also treated Jane Doe and plaintiff inequitably; where there was identical evidence related to each of them he ignored the evidence that harmed Jane Doe's case and only credited the evidence that helped her. *See* Exhibit P-1 ¶¶ at 80-83.

The HRO misstated evidence in the record to make it appear less favorable to plaintiff. *Id.* ¶¶ 84-97. In one instance, he fabricated a series of events that never occurred in the SIT proceeding in order to undermine plaintiff's credibility. *Id.* ¶ 92-97. Where the HRO appeared to have questions about the evidence he never asked the investigator or plaintiff, who met with him, to further explain events. Instead he drew the most prejudicial assumptions he could against plaintiff, even where those assumptions were entirely implausible. Exhibit S-11 at 7-8, 8-9. In the end, the HRO came to a conclusion Jane Doe had never advanced: that plaintiff had not only failed to obtain consent for sexual activity with her, but that he had in fact created an elaborate, premeditated plan to lure Jane Doe to come to his room to sleep with him and Witness 1 so that he could perpetrate a premeditated sexual assault. Exhibit S-11 at 17.

Middlebury's policies guarantee students that they will be treated equitably, fairly, and in an unbiased manner, yet Middlebury trains its administrators to begin investigations biased

against the accused student, to assume his guilt, and to use the investigation as a way to craft a case against him. The investigator and HRO in plaintiff's case did just that, violating Middlebury's contractual obligations to him.

### 3. Middlebury Failed to Adhere to its Time Frames for Investigation and Adjudication

The SMDVS states that absent extenuating circumstances the investigation of a complaint will be completed within 45 days from the time the complaint is made. Exhibit P-4 at § 10(G). The policy states the investigation is to begin when the HRO or Judicial Affairs Officer (JAO) receives actual notice of the complaint. *Id.* at § 10(C).   SIT notified Middlebury of the complaint in mid-November 2014.  Pursuant to the SMDVS the administrator who received that notice, Stacey Thebodo, was obligated to immediately report it to Middlebury's Title IX Coordinator, the HRO, or the JAO.  *Id.* at § 9.  The investigation should thus have been completed no later than the end of December 2014. Middlebury did not even *begin* its investigation until a month after the deadline for its completion.

Even if Middlebury argues, as it has previously to plaintiff, *see* Exhibit S-10, that the JAO had no actual notice until Jane Doe contacted her on January 2, 2015, the investigation still was required to be completed by February 16, 2015.  Instead, the investigation was completed when the investigator forwarded her report to the HRO for a decision on July 2, 2015.

Middlebury never gave plaintiff any legitimate justification for the extensive delay in investigating his case. On March 6, 2015, weeks after the 45-day deadline had expired even under Middlebury's erroneous understanding of when it began, the JAO, Karen Guttentag, notified plaintiff that the investigation would take longer than Middlebury's policies allow. She gave no explanation for why the investigation needed to be prolonged. In subsequent emails in March and April 2015, Guttentag justified the delay by saying the investigator was having

trouble reaching witnesses in the country where the SIT program had taken place. Yet the

investigator did not even attempt to reach those witnesses until March 1 and March 12, 2015,

Exhibit S-1 at 48-51, 56, well after the 45-day deadline had already expired.

The delay in the investigation caused evidence to be lost or destroyed. Witness memories

of events were corrupted or lost. Witness 1, who had been in the room with plaintiff and Jane

Doe when they engaged in sex, testified differently to the Middlebury investigator than she had

to SIT, who interviewed her days after the incident and had her testify at a hearing only a few

weeks later. Exhibit S-11 at 6-7. Other witnesses, too, told stories that were more prejudicial to

plaintiff than they had immediately after the incident. *Id.* at 3. Furthermore, as witnesses told

the Middlebury investigator, all of the students from the SIT trip were "on [Jane Doe's] side,"

and she had told them what happened in the SIT proceedings. Exhibit S-1 at 8, 55. These

witnesses, most of whom had refused to be interviewed by plaintiff's legal representatives

immediately after the incident, Exhibit P-8, had months to discuss the case among themselves

before they were interviewed by Middlebury's investigator. Middlebury's investigator never

asked any of the witnesses about their conversations with one another or with Jane Doe, and

never probed whether the witnesses had any bias against plaintiff. Middlebury's unlawful delay

in its investigation allowed these witnesses to develop narratives more prejudicial to plaintiff

than those they likely would have reported immediately after the incident.

### B.  Middlebury Violated Title IX by Using Plaintiff's Gender as a Motivating Factor in Its Discipline of Plaintiff

The Second Circuit set forth the standards for assessing Title IX claims regarding

university discipline in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1993). To make out a

claim that a college reached an erroneous outcome in a disciplinary proceeding in violation of

Title IX the plaintiff must "allege particular facts sufficient to cast some articulable doubt on the

accuracy of the outcome of the proceeding," and "must [] also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.* at 715. The Court noted that the pleading burden with regard to the facts supporting the inaccuracy of the outcome "is not heavy." *Id.*

Middlebury reached an erroneous outcome in finding plaintiff responsible for sexual misconduct. SIT, considering live witness testimony presented within weeks of the incident, as well as substantial photographic and other evidence, found that plaintiff did not engage in non-consensual sex with Jane Doe. Middlebury failed to examine the differences between witnesses' testimony to SIT and to Middlebury, and failed to consider whether the testimony given immediately after the incident was more reliable than that given to Middlebury's investigator months later and after Jane Doe had already lost her case once at SIT. Furthermore, Middlebury's investigator and HRO misstated and misconstrued facts in order to find plaintiff not credible; a determination that was crucial to their ultimate finding of responsibility in this case that rested on believing either plaintiff or Jane Doe's version of what occurred between the two of them. These facts, as well as the additional facts set forth in the complaint, cast significant doubt on whether the outcome of the Middlebury proceeding was correct.

Middlebury trains its employees, including those who decided plaintiff's case, to discriminate against men in these proceedings. The Middlebury training materials have as a basic premise the idea that only men commit sexual assault, and that those men accused of sexual assault are invariably guilty. The statistics presented to Middlebury administrators regarding sexual assault are entirely based on studies of assaults by men on women; in only two slides does it mention, as an aside, the possibility of men being the victims rather than perpetrators of assault. Exhibit P-7 at 2, 11. After providing these statistics on sexual assault,

the title of the next slide is "What about the guys?" That slide presents statistics about men committing assault. *Id.* at 3. In the entire presentation there is never an example of a sexual assault case in which the respondent is a woman, every example uses the term "he" for respondents and "she" for victims. *See, e.g., id.* at 30. The evidence of the erroneous outcome in this case coupled with the evidence of gender bias establishes that plaintiff is likely to succeed on the merits on his Title IX claim. *See Doe v. Washington and Lee University,* No. 14-cv-00052, slip op. at 17-18 (W.D. Va. Aug. 5, 2015) (attached hereto as Exhibit P-9) (finding that plaintiff "plausibly established a causal link between his expulsion and gender bias" by pointing to university official's endorsement of article written for female-focused website that mirrored facts of plaintiff's case and the fact that official wielded significant influence on case). *Contrast* Order granting in part and denying in part Defendant's Motion to Dismiss in *Doe v. Salisbury University*, No. 15-cv-00517, at *22 (D. Md. Aug. 21, 2015) (finding insufficient evidence of gender motivating a disciplinary decision where school publications and policies were neutral as to the gender of sexual assault victims and perpetrators) (attached hereto as Exhibit P-10).

### C. The Questions Going to the Merits are Serious, and the Balance of Hardships Favors the Plaintiff

Even if the court determines that plaintiff is not likely to succeed on the merits, it should nonetheless issue a preliminary injunction because there are "sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in [plaintiff's] favor." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002).

As explained above, there are serious questions going to the merits of plaintiff's claims, and he will suffer extreme hardship if the injunction is not granted. In contrast, there is no harm to Middlebury if the preliminary injunction is granted. The complainant in this case does not attend Middlebury, there is therefore no concern about plaintiff interacting with her if allowed to

continue his studies at Middlebury. The only potential harm to Middlebury would be if plaintiff were a threat to Middlebury students.  Although Middlebury argued (incorrectly) that it was entitled to conduct an investigation and adjudication of Jane Doe's complaint because of its concern that plaintiff might pose a threat to the Middlebury community, its actions to date demonstrate that concern to be a pretext.

Middlebury was alerted to Jane Doe's accusations in November 2014, and took no action to investigate those allegations or to place any restrictions on plaintiff upon his return to campus in January 2015. When Middlebury was notified that Jane Doe had taken out a no-trespass order against plaintiff with the local police department where she attends school, its response was to offer to help plaintiff take out his own no-trespass order against her, not to question whether he was a danger to their students.  Exhibit P-1 ¶ 51.  Middlebury had remedies available to it on an interim basis to protect students if it felt such steps were necessary, including interim suspension pending the outcome of its investigation.  Exhibit P-4, § 13.  Middlebury never took such steps. Nothing in Middlebury's actions indicates any belief that plaintiff posed or poses any threat to the Middlebury community.  *See* Order granting preliminary injunction, *Doe v. George Washington University*, *supra* (finding the public interest did not strongly weigh in favor of denying the motion for preliminary injunction where the university had taken few measures to restrict plaintiff's conduct on campus).

As SIT correctly found, plaintiff did not commit any sexual assault, and there is therefore no reason to believe him a risk to Middlebury. There is no harm to Middlebury in allowing plaintiff's motion for a preliminary injunction, and allowing him to return for the fall 2015 semester and engage in his studies just as Middlebury allowed him to do for the spring 2015 semester.

## CONCLUSION

Plaintiff respectfully requests the Court enjoin Middlebury College from expelling him and from preventing him from enrolling in courses for the fall 2015. Plaintiff is likely to prevail on the merits of his claims, and will suffer irreparable harm if the injunction is not granted. There is no other adequate remedy at law.  Plaintiff respectfully requests oral argument and an evidentiary hearing if necessary.

Date: August 28, 2015

Respectfully submitted,

LISA B. SHELKROT (BBO #3127)
LANGROCK SPERRY & WOOL, LLP
210 College Street
PO Box 721
Burlington VT 05402
(802) 864-0217
LShelkrot@langrock.com

MONICA SHAH (Mass. Bar. No. 664745)
NAOMI SHATZ (Mass. Bar. No. 677637)
ZALKIND DUNCAN & BERNSTEIN LLP
65a Atlantic Avenue
Boston, MA 02110
(617) 742-6020 (telephone)
(617) 742-3269 (fax)
mshah@zalkindlaw.com
nshatz@zalkindlaw.com
*Motions for admission pro hac vice pending*

*Attorneys for Plaintiff John Doe*

## Certification Pursuant to L.R. 7.0(a)(7)

I hereby certify that I have conferred with Jeffrey Nolan, counsel for defendant Middlebury College, in an attempt to obtain assent to this motion.  Defendant Middlebury College does not assent to this motion.

## Certificate of Service

I have served the foregoing document on the following counsel, who is authorized to accept service for Middlebury College, by e-mail: Jeffrey J. Nolan. Dinse Knapp & McAndrew, P.C., P.O. Box 988, 209 Battery Street, Burlington, Vermont 05402 (jnolan@dinse.com).