# EXHIBIT P-1

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| JOHN DOE,<br><br>        Plaintiff,<br>v.<br><br>MIDDLEBURY COLLEGE,<br><br>        Defendant. | Docket No. |

## AFFIDAVIT OF PLAINTIFF JOHN DOE IN SUPPORT OF HIS MOTION FOR A PRELIMINARY INJUNCTION

I, ▉▉▉▉▉▉▉, hereby declare as follows:

1. I am the plaintiff in the above-captioned lawsuit.

2. Until August 26, 2015 I was a student at Middlebury College, preparing to begin my senior year on September 16, 2015.

3. I was accepted to Middlebury College in the spring of 2012, and enrolled as a freshman in the spring 2013 semester. Because I had sufficient advance placement credits from high school to allow me to graduate in fewer than four years, I intended to graduate in the summer of 2016.

4. In the spring of 2014, I applied to participate in a study abroad program for the fall 2014 semester through Middlebury's Office of International Programs. I applied to a study abroad program run by the School for International Training ("SIT").

5. I believe Middlebury has a longstanding relationship with SIT. Each year, over 50% of Middlebury's junior class studies abroad. Many Middlebury students attend SIT's various study abroad programs each year.

6. In order to study abroad I had to first obtain approval from Middlebury to apply to the SIT program. I then applied directly to SIT, and was required to keep Middlebury up to date on the status of my SIT application.

7. In the fall of 2014, after Middlebury approved my study abroad application, I participated in an SIT study abroad program in a foreign country. Jane Doe, a student from another university was also a participant in that program.

### The Sexual Interaction at SIT

8. On the night of November 7, 2014, a group of students from my study abroad program, including me and Jane Doe, went to dinner, a music show, and then a club in the city near our local college campus.

9. While both Jane Doe and I drank alcoholic beverages, I do not believe either of us appeared substantially impaired or incapacitated to anyone who saw us that night.

10. After arriving back on campus late that night, Jane Doe, another female member of the group, Witness 1 (with whom I had a sporadic sexual relationship), and I decided to all sleep in my dorm room. The three of us sent text messages back and forth discussing the plan and making arrangements.

11. I left my room to go to Witness 1's room and ask her to bring a set of sheets over to use on my roommate's bed. Witness 1 and I walked most of the way back to my room together (with the sheets) and then I ran ahead to unlock my door and go to the restroom.

12. Witness 1 was in my room when I returned from the restroom. Witness 1 and I pushed my bed and my roommate's bed together to form one bed. Jane Doe arrived and all three of us got into the joint bed. Witness 1 and I kissed each other for a few minutes before Witness 1 expressed discomfort at kissing with Jane Doe in the bed, and we stopped kissing.

13. I rolled over onto my back to go to sleep, and when I did my hand touched Jane Doe's hand.

14. Jane Doe took my hand and put it down her shorts, causing me to touch her genitalia. When I withdrew my hand she grabbed it and put it back down her shorts, then touched my genitalia.

15. Jane Doe asked "Do you want to have sex?" When I said "I don't know" and asked whether she wanted to have sex she said "yes."

16. Jane Doe helped me put on a condom, and then she removed her pajama shorts, under which she was not wearing underwear.

17. Jane Doe and I began to have intercourse.

18. After a few seconds, I noticed Witness 1 crawling off the bed and exiting the room.

19. I looked up to watch Witness 1 go, and as I did I stopped having intercourse with Jane Doe.

20. When I looked back at Jane Doe I saw a blanket covering her face.

21. I removed the blanket, and Jane Doe asked "Where did Witness 1 go?" I said Witness 1 had left because she saw us having sex, and Jane Doe responded "Witness 1 is going to kill me."

22. Jane Doe put on her pajama shorts, gathered a blanket and pillow she had brought to my room, and left the room.

23. The next day Jane Doe spoke to her friends about her encounter with me and began to tell other students in the program that she had not consented to sex with me.

24. On November 9, 2015, Jane Doe's friend notified our academic director that Jane Doe reported that she had non-consensual sex with me. The program leader interviewed me, Jane Doe, and Witness 1 about the events of the night of November 7-8.

25. The program leader informed me that she notified the administrators at SIT in Vermont that there had been a complaint of non-consensual sex.

26. A few days after the sexual interaction with Jane Doe, I walked from the university campus to a store near the campus with Witness 1 and another classmate.

### SIT Finds Me Not Responsible for the Charge

27. On November 10, 2014 SIT administrators in Vermont interviewed Jane Doe via telephone. On November 13, 2014 SIT administrators in Vermont interviewed Witness 1 via telephone. On November 13, 2014, I submitted a written statement to SIT in lieu of being interviewed by telephone.

28. On November 13, 2014, SIT formally charged me with a violation of its sexual harassment policy and student conduct policy and notified me that a hearing on the charge would be held.

29. In the notice, a copy of which was sent to Jane Doe, I was provided with the SIT hearing policies, and I was informed of my right to call witnesses at the hearing and to bring an advisor to the hearing. The complainant, Jane Doe, was also guaranteed those rights under the SIT policy.

30. Based on emails in the possession of Middlebury that I have reviewed, I believe that on or about November 17, 2014, SIT administrators contacted the Middlebury Study Abroad Office and notified it of the complaint that had been made against me, and the steps it was taking to address the complaint.

31. The SIT hearing was held on December 2, 2014, at the SIT campus in Brattleboro.

32. I attended the hearing with my attorney as my advisor; Jane Doe attended with a victim's advocate from her university as her advisor.

33. Both Jane Doe and I submitted photographic and documentary evidence for consideration at the hearing. Jane Doe also submitted medical reports of an exam she had three days after having sex with me, and an exam she had roughly twelve days later at her pediatrician's office.

34. I submitted two expert witness reports addressing Jane Doe's medical evidence and assertions she made that she was incapacitated by alcohol at the time of the encounter.

35. At the hearing, each of us was given the opportunity to make an opening statement, to explain the evidence we had presented, to ask questions of one another and of Witness 1, who was called as a witness, and to make closing statements. Each of us was also questioned by the SIT hearing officer, who was a trained attorney. The hearing was recorded.

36. In her interviews with SIT and at the hearing, Jane Doe told a false account of what happened between us on November 7-8, 2014.

37. Jane Doe claimed that she drank a number of alcoholic drinks that night, that she had no memory of events of leaving the club we had attended and returning to campus, and the first thing she remembered was being in my room while we were engaged in intercourse roughly one hour later.

38. Jane Doe denied any memory of how she got from the club back to campus, how she changed into her pajamas, the numerous text messages she sent and received, and any memory of taking her pillow and blanket and walking to my room.

39. Jane Doe denied any memory of initiating sexual contact with me or of her conversation with me about whether we each wanted to have sex.

40. Jane Doe claimed that the next thing she personally remembered was me on top of her having intercourse with her.

41. Jane Doe claimed that when she "woke up" there was a sheet covering her face and my hand was on top of the sheet over her mouth. She alleged that she screamed and yelled and told me "get off me," "I don't want this," and asked "where did Witness 1 go?"

42. Witness 1 also testified at the SIT hearing. She testified that after kissing me while she, Jane Doe, and plaintiff were in the bed together, she rolled over toward the wall.

43. Witness 1 testified that when she rolled back she saw me on top of Jane Doe and saw that we were having sex.

44. Witness 1 testified that she climbed out of bed and left the room. She testified that as she left the room she heard moaning.

45. Witness 1 testified that she did not hear Jane Doe say "get off me" or "I don't want this" and she did not hear Jane Doe yell or scream.

46. At the end of the hearing the hearing officer provided me and Jane Doe each with a copy of all of the materials from the hearing. A few days later he provided me with a recording of the hearing.

47. On December 11, 2014, the SIT hearing officer issued his decision finding that I had not violated SIT's policies. I believe SIT communicated the decision to administrators at Middlebury.

48. I was informed by SIT that Jane Doe did not appeal the decision.

## Middlebury's Second Investigation

49. I returned to Middlebury on January 4, 2015 and moved into my on-campus housing. No Middlebury administrator raised any concern with me about my return to campus. In fact, no Middlebury administrator mentioned the SIT case to me at all.

50. On January 8, 2015, I received a no-trespass order issued by the local police department where Jane Doe attends school prohibiting me from entering Jane Doe's apartment.

51. On January 12, 2015, I met with Dean of Middlebury College Matt Longman to discuss the no-trespass order. Dean Longman offered to help me obtain a no-trespass order against Jane Doe if I should want one. I declined his offer.

52. On January 23, 2015, I met with Dean Guttentag. My father participated in this meeting by telephone. She gave me a notice that Jane Doe had alleged to Middlebury that I sexually assaulted her in November and that Middlebury was instituting an investigation into the matter. She told me that she did not know how SIT's policies and procedures related to Middlebury's in my case.

53. The notice states Middlebury had the authority to conduct the investigation because Dean Guttentag had determined that my "alleged actions occurred off campus but may represent a threat to the Middlebury community." The notices states that Middlebury had appointed Nell Coogan as the investigator in my case.

54. Middlebury's Study Abroad Pre-Departure Handbook ("Pre-Departure Handbook") provides that the externally sponsored program or host university is responsible for evaluating and determining disciplinary violations for study abroad students in external programs like SIT with respect to honor code violations. Under the provision, Middlebury reserves the right to take disciplinary action upon the student's return, but does not reserve the right to evaluate

the disciplinary violation in the first instance. The provision does not allow a student to appeal a disciplinary procedure determined by the externally sponsored program or host university. Although the provision explicitly applies to honor code violations, there is no explicit adoption of the SMDVS in the Pre-Departure Handbook. Upon reviewing the Pre-Departure Handbook, I expected that this provision applies to all disciplinary violations, including SMDVS violations.

55. Before leaving to study abroad I signed an Acknowledgment and Assumption of Risk and Release Agreement provided by Middlebury. In the acknowledgment, I agreed that my "participation in the Program will be subject to the standards of behavior and academic requirements of the sponsoring U.S. institution and any host institution," "recognized that it is my responsibility to familiarize myself with such standards and requirements," and agreed that "if I fail[ed] to comply with such standards and requirements I may be subject to discipline, up to and including dismissal from the Program."

56. On January 28, 2015, my mother and I met with Dean Longman to review my student record. I reviewed emails between SIT and Middlebury from November and December 2014 regarding the complaint made against me and SIT's resolution of the complaint. In that meeting, Dean Longman told me that he had kept up to date with the SIT process so he would know if there was any problem with me returning to the Middlebury campus, and that there was no such problem.

### The Second Investigation

57. The investigator, Coogan, first interviewed me on February 27, 2015 and took more than four months from that point to complete the second investigation.

58. Coogan, spent months amassing irrelevant evidence for the case, including witness statements from eight other students on my study abroad trip, none of whom were in the room at the time of the incident. Coogan asked the witnesses to opine on Jane Doe and my credibility, and recount conversations they had with me and Jane Doe, as well as conversations they had with one another, about the incident. She also interviewed Jane Doe's pediatrician, and obtained her thoughts on Jane Doe's credibility and her opinion that "this is not something she would make up."

59. Coogan did not record any of these interviews, and instructed me and my advisor that we were not permitted to record her interviews of me. Coogan's reporting of my statement to her is inaccurate in at least one material instance.

60. On May 20, 2015 and on June 19, 2015, Middlebury released the evidence Ms. Coogan had collected. Ms. Doe and I had an opportunity to respond to the materials. I repeatedly requested to be provided with a copy of Ms. Doe's responses, but Middlebury refused to provide them.

61. On June 23, 2015, once I no longer had any opportunity to submit further written responses or evidence, Middlebury provided me with Ms. Doe's written submissions in the case.

62. On June 28, 2015, I traveled to Middlebury to meet with Steven Collier ("Collier"), the Human Resources Officer deciding my case. Collier permitted me to make a statement, then asked me one question. The meeting lasted less than twenty minutes.

63. On July 10, 2015, nearly six months after Middlebury began the second investigation, Middlebury provided me with Coogan's investigation report and Collier's findings and decision, which were based on that report and concluded that I violated Middlebury's SMDVS policy.

64. Coogan's report misrepresented critical facts, and made findings that were unfair and biased against me. I was never provided any opportunity to read or respond to Coogan's report before I met with Collier or before Collier made his decision.

65. In contrast to SIT's hearing process, there was no formal hearing at Middlebury. Neither Jane Doe nor I were entitled to make opening or closing statements, present evidence, or cross-examine witnesses.

66. Based on Coogan's report, Collier incorrectly found not only that Jane Doe had not consented to the sexual interaction, but that I had devised a premeditated plan to assault Jane Doe while she was asleep and then pretend the assault had never occurred.

67. In order to arrive at this false conclusion, Collier disregarded the first decision made by SIT, which was based on an investigation much closer in time to the incident and found me not responsible, and ignored substantial evidence in the record supporting my case and undermining Jane Doe's case. His treatment of the evidence shows his bias against me, and demonstrates that he went into the hearing process looking to find me guilty and molded the evidence to support that conclusion.

<u>Collier ignored evidence supporting my claims and undermining Jane Doe's</u>

68. Collier failed to consider any evidence that called into question Jane Doe credibility. This includes her misrepresentation to Dean Guttentag that she was providing her with all of the materials from the SIT hearing to which she had access, when in fact she only provided materials that supported her claim. It was I who provided Middlebury with the full file from SIT so that it could have all of the relevant evidence in the case.

69. Collier also failed to consider the ways in which Jane Doe's allegations became more extreme over time. At the SIT hearing less than a month after the night in question Jane Doe

10

stated that she woke up while we were having intercourse, and that she said "Get off me. I don't [want] this. I don't want to have sex with you," and asked where Witness 1 had gone. By the time she was first interviewed by Coogan in early February 2015, Jane Doe was alleging that not only did she make those statements, but she had "pulled [my] hand off" of her mouth in order to ask those questions. She then told Coogan she told me to get off of her, and I got off. When she was interviewed by Coogan in mid-March she further embellished her resistance to the sex act, saying when she "woke up" she was gasping and could not breathe easily, and that she yelled, not said, "get off me." She told Coogan she pushed my hand off of her mouth, pulled the sheet off of her face, and moved her body away from me and pushed me away from her. Neither Coogan nor Collier ever discussed or questioned the evolving details of Jane Doe's account.

70. Collier also failed to consider any evidence that called into question the credibility of Jane Doe's friends who were interviewed during the investigation.

71. One friend, Witness 2, refused to be interviewed by my counsel in November, but spoke with Coogan in February 2015. At that point, as another witness stated, Jane Doe had informed everyone on the study abroad trip that she had lost her case at SIT, and upon information and belief had told them she was pursuing a claim at Middlebury. Collier never questioned whether that friend might be biased in her reporting of events because of her friendship with Jane Doe. Despite this possible bias, Collier credited Witness 2's statements about what I said when confronted by her on November 8, even though Witness 2's statements about that encounter are contradicted by my account and another witness's account of that meeting.

72. Witness 1, who described Jane Doe as her "best friend" on the program, told Coogan that she was "biased in favor of [Jane Doe]," and recounted for Coogan numerous prejudicial statements she alleged I made that were contradicted by the statements of multiple other witnesses and her own statements to SIT. Collier never addressed whether Witness 1 was biased, and credited her statements to Coogan even though their veracity was directly challenged by her prior statements and statements of other witnesses.

73. There was also significant evidence undermining Jane Doe's factual assertions.

74. Witness 1 consistently reported that when she saw me and Jane Doe engaging in sex she believed it was consensual. She reportedly continued to believe the sex was consensual until she had a conversation with Jane Doe the following morning. She told Coogan that she continued to socialize with me even after Jane Doe made her allegations.

75. Witness 1's testimony regarding how she exited the bed indicated she crawled over or within inches of Jane Doe's head at the time Jane Doe and I were engaged in sexual intercourse. Witness 1 never reported that she saw a blanket covering Jane Doe's face or saw my hand covering Jane Doe's mouth.

76. Jane Doe has consistently stated that upon "waking up" while engaged in intercourse with plaintiff she asked "where did Witness 1 go?" She has also consistently stated that she "woke up" with a blanket covering her face and that Witness 1 was no longer in the room when she asked this question.

77. Jane Doe also maintained that she has no memory between leaving the dance club with a group of her friends and "waking up" in the middle of sex with me.

78. Jane Doe has never explained, and Coogan and Collier never inquired, as to how she could have known Witness 1 was ever in the room with her if she has no memory of anything leading up to being engaged in sex and if her face was covered when she regained memory.

79. Multiple witnesses said that Jane Doe's initial concern about the situation was that Witness 1 would be angry at her for engaging in intercourse with me. One witness said that the day after the incident Jane Doe told Witness 3 "I've made a stupid drunken mistake and hurt my friend [Witness 1]."

<u>Collier's treatment of the evidence was biased against me</u>

80. Where Collier was presented with the same type of evidence that related to me and to Jane Doe, he only credited that evidence that supported Jane Doe's case and undermined mine.

81. For example, there was testimony from multiple witnesses that Jane Doe had no prior sexual interest in me, and there was testimony from multiple witnesses that I had no prior sexual interest in Jane Doe. Collier only credited the evidence that Jane Doe had no sexual interest in me, and then came to the conclusion that I *did* have sexual interest in Jane Doe.

82. In reaching that conclusion, Collier determined that because I had intercourse with Jane Doe on the night of November 7-8 I must have been interested in her, yet he did not come to the same conclusion that the fact that she had sex with me that night must have indicated Jane Doe was interested in me.

83. Collier determined that my account was not credible because I did not explain to Witness 1 what happened between me and Jane Doe the first time I saw her after the night in question, but does not question Jane Doe's credibility even though she also did not tell Witness 1 her side of the story the first time she saw her after the incident.

84. Collier misstated evidence to make a case against me that the actual evidence did not support.

85. Collier focused on the issue, never previously contested, of whether I went to Witness 1's room to ask her to bring sheets for my roommate's bed.

86. Witness 1 told Coogan that she did not remember me coming to her room to ask for sheets, and that she did not remember bringing sheets to my room.

87. Witness 1 told other witnesses, however, that I had come to her room that night before we returned to my room.

88. Collier, ignoring the evidence that Witness 1 had initially remembered me coming to her room that night, incorrectly stated that Witness 1 had "denied" that I came to her room. Witness 1 had never made such a denial, at most she claimed to not remember me coming to her room.

89. Collier stated that in his various statements, testimony, and interviews, I had been inconsistent about the exact sequence of events surrounding my trip to Witness 1's room to ask for the sheets, and my return to his room.

90. The evidence did not show inconsistencies; at most it showed that in different recounting of those events I highlighted different moments in the same sequence of events.

91. In our meeting, Collier never asked me any questions about this evidence in order to clarify what happened.

92. In November 2014 my attorney and a paralegal from her firm interviewed two of the students on the SIT study abroad program about their memories of the night of November 7-8. One of those students, Witness 3, said in that interview that his dorm room shared a wall

with mine, and that on the night of November 7 he went home early and went to sleep, that he was fast asleep, and that he did not hear any noise from plaintiff's room.

93. Coogan interviewed Witness 3 in February 2015, and he told her that while he never heard yelling or screaming from my room, he woke up in the middle of the night and heard me and Jane Doe talking.

94. Coogan asked me and my attorney for a summary of her conversation with Witness 3; I provided that summary to Coogan in March 2015.

95. In his findings Collier incorrectly states that I submitted the written summary prepared for Coogan to SIT, that the summary incorrectly reflected what Witness 3 had told my attorney and paralegal, that I knew the summary was incorrect or incomplete, and that I intentionally misled SIT into believing Witness 3's memory of that night supported my story when it did not.

96. Collier used that false evidence to determine that "[my] argument to SIT and [my] presentation of the evidence was incomplete, and [my] tactic does not enhance [my] credibility or lead [Collier] to conclude that [I am] wedded to the truth."

97. In our meeting, Collier never asked me any questions about this evidence in order to clarify what happened.

### The Sanction and Appeals Process

98. I submitted a sanction statement to Vice President for Student Affairs and Dean of the College Katharine Smith Abbott ("Abbott") on July 17, 2015, arguing that a severe sanction was not warranted in this case.

99. On July 24, 2015, Abbott issued a sanction expelling me from Middlebury.

100. On July 28, 2015, I appealed the finding against me to Vice President for Academic Affairs Andrea Lloyd ("Lloyd").

101. In my appeal, I argued that Middlebury's policies did not permit it to institute a second investigation and *de novo* review of Jane Doe's complaint when SIT had already investigated the case and determined I had not engaged in non-consensual sex with her. I also argued that the investigation and adjudication violated Middlebury's policies and the law because the investigation was unduly delayed and the processes were unfair and biased.

102. Lloyd denied my appeal on August 4, 2015.

103. On August 11, 2015, I submitted a final appeal to Middlebury President Laurie Patton ("Patton") and met with her on August 24, 2015.

104. On August 26, 2015, Patton denied my final administrative appeal.

### Consequences of Middlebury's Decision

105. I expected to graduate Middlebury in the summer of 2016.

106. On August 14, 2015, I was offered a position at a company to begin in July 2016, contingent upon my graduation from Middlebury.

107. My starting salary in this position was to be $85,000/year, and I was to receive a $10,000 signing bonus and $5,000 in relocation costs. I expected to receive additional bonuses pursuant to the company's discretionary incentive program during the tenure of my employment at the company.

108. As a result of Middlebury's actions, I will lose this job offer.

109. As a result of Middlebury's actions, my education will be put on hold and possibly terminated.

110.    Nothing in my academic or disciplinary record reflects that SIT considered these charges against me and found me innocent.

111.    My academic and disciplinary record has been destroyed, and there is an extremely remote chance that I will be able to complete my undergraduate degree at any school of a similar quality to Middlebury.

112.    Because of this expulsion on my record, the possibility that I will gain entry into graduate school is likewise remote.

113.    As a result of Middlebury's actions, I have suffered stress and mental anguish, and underwent counseling on a regular basis throughout the spring semester.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Sworn and subscribed in my presence this 27th day of August, 2015

_John Matt_
Notary Public
My Commission expires:
2/10/19